IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| FOREST GUARDIANS, et al., | No. CV 99-61-TUC-WDB |
| Plaintiffs, | **ORDER** |
| vs. | |
| ANIMAL AND PLANT HEALTH INSPECTION SERVICE, et al., | |
| Defendants, | |
| and | |
| THE STATE OF ARIZONA, | |
| Defendant-Intervener. | |

    Pending before the Court are cross motions for summary judgment. Plaintiffs are a coalition of environmental groups and one individual who allege that Defendants Animal and Plant Health Inspection Service (APHIS) and the United States Forest Service (USFS) violate the Wilderness Act when they kill wild predators in wilderness area in order to protect private livestock. Plaintiffs further allege that Defendants violate the National Environmental Policy Act (NEPA) by engaging in those killings before making required studies. Defendant-Intervener State of Arizona intervened over concerns over the scope of relief requested. However, as explained below, Defendants' interpretation of the Wilderness Act is reasonable and their implementation of the Act are not arbitrary or capricious. Furthermore, Defendants have complied with NEPA through conducting a series of



environmental studies. Therefore, Plaintiffs' motion for summary judgment will be DENIED and Defendants' motion for summary judgment will be GRANTED.

**Introduction**

The resolution of the cross motions for summary judgment turns on three issues. First, whether the Wilderness Act allows lethal predator control in wilderness areas. Second, whether, if lethal predator control is allowed, its implementation in the Santa Teresa Wilderness is arbitrary or capricious. Third, whether APHIS and USFS (known collectively as Federal Defendants) satisfied NEPA requirements when they implemented their lethal predator control program.

As in all cases, Plaintiffs also must establish standing in order to bring suit in federal court.

**Standing**

Standing is jurisdictional and must be examined by the Court even if the parties fail to raise it. *See United States v. Hays*, 515 U.S. 737, 742 (1995) (citation omitted). Standing requires (1) an injury in fact, (2) a casual connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). At the summary judgment stage, standing may be proven by affidavits. *Id.* at 561.

Plaintiffs filed an affidavit of John Horning, the one individual plaintiff, which establishes standing sufficient for the summary judgment stage.

**Appropriateness for Summary Judgment**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Judicial review of Federal Defendants' actions under the APA is limited to the

administrative record. *See Northcoast Environmental Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998). Federal Defendants have submitted the administrative record. Therefore, there are no material disputed facts and Plaintiffs' claims may be resolved on motions for summary judgment. *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

**Whether the Wilderness Act allows lethal predator control in wilderness areas**

The Court reviews Federal Defendants' interpretation of the Wilderness Act under the standard articulated in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Under *Chevron*, Federal Defendants and the Court must give effect to Congress's clear intent as expressed in the statute. *Id*. However, if Congress is silent or ambiguous in the statute, then the Court must defer to Federal Defendants' reasonable construction of the statute. *Id*. Furthermore, Federal Defendants' interpretation of the statute is given substantial deference because Congress charged the USFS with implementing the statute. *Id*. at 844.

In this case, as discussed below, Congress was silent or, at most, ambivalent on whether to allow lethal predator control in wilderness areas to promote private livestock operations. Federal Defendants' interpretation of the statute to allow lethal predator control is a reasonable construction of the statute.

*Congressional was silent or ambiguous*

The parties point to three statements made by Congress to address the issue of congressional intent. First, the Wilderness Act itself states that "the grazing of livestock, where established prior to September 3, 1964, shall be permitted to continue subject to such

- 3 -

reasonable regulations as are deemed necessary by the Secretary of Agriculture." 16 U.S.C. § 1133(d)(4). The regulations have similar broad language.[1]

Thus, Congress is silent on lethal predator control in its first statement about private livestock grazing.

Second, Congress stated that the provisions of the Wilderness Act relating to the grazing of livestock "shall be interpreted and administered in accordance with the guidelines" contained in House Report 96-617. Pub. L. No. 96-560 at § 108. Congress's stated purpose in writing these congressional grazing guidelines, "Grazing in National Forest Wilderness Areas," was to respond to efforts to amend the section of the Wilderness Act which allows for livestock grazing to continue. Congress stated that "The legislative history of this language is very clear in its intent that livestock grazing, and the activities and the necessary facilities to support a livestock grazing program, will be permitted to continue in National Forest wilderness areas, where such grazing was established prior to classification as wilderness." Congress felt that then current USFS regulations were "unduly restricting on-the-ground activities necessary for proper grazing management." H. Report 96-617 at 10. However, instead of revising the relevant section of the Wilderness Act, Congress concluded that "the original broad language of the Wilderness Act is best left unchanged." *Id.* at 11. More specific language in the statute would "deprive the land management agencies of flexible opportunities to manage grazing in a creative and realistic site specific fashion." *Id.*

Thus, in its second statement on private livestock grazing, Congress is silent on lethal predator control but clearly states that activities associated with private livestock grazing should be permitted to continue and that land management agencies should be allowed flexibility in implementing the Act's purposefully broad language.

---

[1] "The grazing of livestock, where such use was established before the date of legislation which includes an area in the National Wilderness Preservation System, shall be permitted to continue under the general regulations covering grazing of livestock on the National Forests and in accordance with special provisions covering grazing units of National Forest Wilderness Areas which the Chief of the Forest Service may prescribe . . . ." 36 C.F.R. § 293.7(a).

Third, the legislative history of the Utah Wilderness Act of 1984 mentions lethal predator control. That legislation brought certain lands in Utah under the protection of the Wilderness Act. The House and Senate reports regarding the Utah legislation stated that the "Committee wants to make it clear, as it has in the past, that [designation as a national wilderness area] does not preclude a number of activities, including control of predators, all of which are conducted pursuant to such reasonable regulations as the Secretary of Agriculture may prescribe." House Report No. 98-1019 at 16; *see also* Senate Report No. 98-581 at 26.

The significance to this case of this third statement by Congress is unclear. It is questionable how much weight legislative history deserves. *See, e.g., City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 337 (1994) ("[I]t is the statute, and not the Committee Report, which is the authoritative expression of the law . . . .") The relevance of the legislative history is further undermined here where the legislative history concerns an act collateral to the one Federal Defendants interpret. In any case, at most the Utah legislative history makes Congress's intent ambivalent as it relates to lethal predator control to benefit private livestock grazing in wilderness areas.

In conclusion, Congress is silent or, at most, ambivalent as to whether the Wilderness Act allows lethal predator control to protect private livestock grazing in wilderness areas.

### USFS's interpretation of the Wilderness Act is reasonable

Because Congress is silent or ambivalent in the Wilderness Act concerning lethal predator control, the Court must consider whether it is reasonable for Federal Defendants to interpret the Wilderness Act as allowing lethal predator control to protect private livestock grazing. *See Chevron*, 467 U.S. at 843. Because Congress has charged Federal Defendants with administration of the statute, their interpretation is entitled to substantial deference. *Id.* at 844.

Federal Defendants' interpretation allowing lethal predator control is reasonable for several reasons. First, private livestock grazing implicitly includes operations to support that grazing, such as lethal control of predators. Lethal predator control is an "activity [which] . . . support[s] a livestock grazing program" and qualifies as the "manag[ment of] grazing in a creative and realistic site specific fashion" as allowed in the congressional grazing guidelines. *See* House Report 96-617 at 11. Second, the legislative history of the Utah Wilderness Act shows that Congress considers lethal predator control to be a reasonable activity in wilderness areas. *See above*. Third, the USFS has consistently interpreted the Wilderness Act to allow lethal predator control. Fourth, courts have recognized that lethal predator control in National Forests is appropriate to protect livestock in certain circumstances *See S. Utah Wilderness Alliance v. Thompson*, 811 F.Supp. 635, 643 (D.Utah 1993).

Plaintiffs argue that Federal Defendants cannot reasonably interpret the Act to allow lethal predator control to protect private livestock grazing unless the Federal Defendants have made a specific finding that private ranchers used lethal predator control prior to the date Congress designated the area as a wilderness area. However, the Wilderness Act may reasonably be interpreted by Federal Defendants to include lethal predator control whether or not such control existed before Wilderness designation. Congress's broad language in the Act and the congressional grazing guidelines do not mandate the restrictive interpretation of the Act urged by Plaintiffs. The congressional grazing guidelines specifically allow for "creative" and "flexible" livestock management. That broad language does not lock Federal Defendants into the specific practices found to be used before the wilderness designation.

In conclusion, Federal Defendants reasonably interpret the Wilderness Act to allow for lethal predator control to protect private livestock grazing.

**The implementation of lethal predator control in the Santa Teresa Wilderness Area**

Even if Federal Defendants reasonably interpret the Wilderness Act to allow for lethal predator control, Plaintiffs may still challenge the implementation of that program under the Administrative Procedures Act if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

*The Forest Service Manual is not legally binding*

Plaintiffs argue that Federal Defendants fail to comply with the Forest Service Manual (FSM) and therefore violate the law. However, the FSM does not legally bind the USFS. A court will only review an agency's alleged non-compliance with an agency pronouncement if that pronouncement has the force and effect of law. *See United States v. Fifty-Three (53) Eclectus Parrots*, 685 F.2d 1131, 1136 (9th Cir. 1982). The FSM does not have the force and effect of law. *See W. Radio Servs. Co., Inc. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996). Alternatively, Plantiffs argue that the FSM is incorporated into the CFR by reference. The Ninth Circuit rejected this argument in a nearly identical context. *Id.* at 902. Thus, the Court will not review Federal Defendants' acts for non-compliance with the FSM but only for arbitrariness or capriciousness.

*Federal Defendants' program is not arbitrary or capricious*

Federal Defendants show that their lethal predator control program is not arbitrary or capricious at two levels. First, at a general level, USFS shows that the program to kill predators to protect private livestock is not arbitrary or capricious. Second, at a specific level, USFS shows that the decisions to kill the particular six mountain lions at issue were not arbitrary or capricious.

That USFS's lethal predator control program in general is not arbitrary or capricious is shown by national and regional level studies. For example, a 1998 Environmental Assessment study by Federal Defendants cited research which found that coyote control

reduced losses. *See* Arizona A.R. Tab 27. APHIS-WS, the specific agency which carries out the killings, also considered the efficacy of both lethal and nonlethal methods of predator control. *See* Arizona A.R. Tab 34 at Chap. 4.

That the specific decisions to kill the six mountain lions at issue here is not arbitrary or capricious is shown by APHIS's operations against the predators. APHIS confirmed the livestock losses and targeted the specific mountain lions responsible for the killings.[2] *See* Arizona A.R. Tabs 13, 19, 20, 23, 28, 29.

Plaintiffs argue that Federal Defendants' lethal predator control program is arbitrary or capricious because it is not effective. Plaintiffs cite two studies which question the efficacy of the program. The first, a 1995 study by the Arizona Game and Fish Department found that killing mountain lions may reduce livestock losses in the short term but not in the long term. *See* Arizona A.R. Tab 5 at 53. The second, a 1990 Environmental Assessment prepared for the Coronado National Forest, cited a 1997 Arizona Game and Fish Department study which suggested that killing mature mountain lions may actually result in an increased density of lions. *See* Arizona A.R. Tab 1, EA at 6.

Plaintiffs' arguments fail. A court reviewing an agency decision under the arbitrary or capricious standard does not substitute its own judgment for that of the agency. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989). Thus, the fact that there is some evidence which suggests that killing mountain lions is an ineffective method of protecting livestock does not make the USFS decision arbitrary or capricious. The USFS based its decision on evidence which did suggest effectiveness. Furthermore, in deciding disputes that involve primarily areas issues that "require a high level of technical expertise, [the court] must defer to the informed discretion of the responsible federal agencies." *Id.* at

---

[2] For example, a typical letter describing a mountain lion kill reads, "The WS [Wildlife Services] Specialist investigated the complaint and confirmed that a male mountain lion had killed a calf valued at approximately $500. On March 22, 1999, the specialist tracked the lion from the kill site using trained dogs and caught it approximately 1/4 mile from the calf carcass." Arizona AR Tab 29.

- 8 -

377. Given that deference, the studies USFS conducted and relied on shows that its decision was not arbitrary or capricious.

**Compliance with NEPA**

Plaintiffs argue that Federal Defendants fail to comply with NEPA because Federal Defendants have not prepared a "site-specific" Environmental Assessment (EA) of the lethal predator control program.

Federal Defendants argue that they have complied with NEPA's requirements. Three studies show their compliance. First, in 1994 APHIS conducted a national Environmental Impact Statement reviewing the potential environmental impact of its lethal predator control program. *See* Arizona A.R. at Tab 34. Second, in 1990, the USFS conducted an EA for animal damage management on the entire Coronado National Forest. *See* Arizona A.R. Tab 1. This report was updated yearly. *See* Arizona A.R. Tabs 10, 14, 24. Third, in 1998, APHIS conduced a new EA analyzing the potential environmental consequences of predator control management on all federal public lands in Arizona. *See* Arizona A.R. Tab 27. This EA specifically considered the use of predator damage control activities in wilderness areas.

Plaintiffs counterargue that such studies are not 'site-specific.' However, a federal agency has the discretion to decide the geographic scope of its NEPA analyses. *See Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976). Thus, Federal Defendants' analyses satisfy environmental reporting requirements.

**Concerns of the State of Arizona**

The State of Arizona's concerns over the scope of relief Plaintiffs request are moot because Plaintiffs will receive no relief.

. . . .

. . . .

. . . .

**Conclusion**

For the reasons given above,

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is GRANTED.

DATED this _13_ day of November, 2000.

William D. Browning
Senior United States District Judge